UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | |
|---|---|
| HOUSE OF RAEFORD FARMS OF LOUISIANA, L.L.C. | CIVIL ACTION NO.: 5:19-cv-00271 |
| VERSUS | JUDGE FOOTE |
| LANCE POOLE AND GROUP 7792, INC. | MAGISTRATE JUDGE HORNSBY |

**FIRST AMENDED AND RESTATED COMPLAINT FOR DAMAGES**

NOW INTO COURT, through undersigned counsel, comes plaintiff, HOUSE OF RAEFORD FARMS OF LOUISIANA, L.L.C., which, with respect, represents:

**I.  PARTIES**

1.

The plaintiff is House of Raeford Farms of Louisiana, L.L.C. ("HORF"). HORF is a Louisiana limited liability company, whose sole member is House of Raeford Farms Inc., a corporation incorporated under the laws of North Carolina with its principal place of business in North Carolina.

2.

Named as defendants herein are the following:

(a)    GROUP 7792 INC. ("Group 7792"), a corporation incorporated under the laws of Arkansas with its principal place of business located in Arkansas. Group 7792 may be served through its registered agent, Lance Norris Poole, at 910 Gibson Hill Road, Farmington, AR 72730.

(b)     LANCE NORRIS POOLE ("Poole"), a person of full age of majority and current resident and citizen of Washington County, Arkansas, who may be served at 910 Gibson Hill Road, Farmington, AR 72730.

(c)     HERITAGE FOOD SALES LLC ("Heritage Food Sales"), a Louisiana limited liability company originally formed by William Ross Hickman, whose sole *present* member is Lance Norris Poole, a person of full age of majority and current resident and citizen of Washington County, Arkansas, who may be served through its registered agent at 910 Gibson Hill Road, Farmington, AR 72730.

(d)     WILLIAM ROSS HICKMAN ("Hickman"), a person of full age of majority and current resident and citizen of Bienville Parish, Louisiana, who may be served at 1050 Elliott Road, Arcadia, LA 71001.

(e)     ANGELA D. HICKMAN ("Angela"), a person of full age of majority and current resident and citizen of Bienville Parish, Louisiana, who may be served at 1050 Elliott Road, Arcadia, LA 71001.

(f)     BRIAN K. WHITEMAN ("Whiteman"), a person of full age and majority and a current resident and citizen of Bossier Parish, Louisiana, who may be served at 3299 Bellevue Rd., Haughton, LA 71037.

(g)     S&S TRADING, L.L.C. ("S&S Trading"), a Texas limited liability company, whose members are Donald E. Vaughn and James S. Baxter, each of whom are residents and citizens of Texas. S&S Trading may be served through its registered agent, Donald E. Vaughn, at 1035 Townplace St., Houston, TX 77057.

- 2 -

(h)     JAMES S. BAXTER ("James"), a person of full age and majority and a current resident and citizen of Montgomery County, Texas, is an officer of S&S Trading who may be served at 246 N. Tranquil Path, Spring, TX 77380.

(i)     ROGER FRANKLIN BAXTER ("Franklin"), a person of full age and majority a current resident and citizen of Montgomery County, Texas, is an employee of S&S Trading who may be served at 22 Bracken Fern Court, Spring, TX 77380.

(j)     DONALD E. VAUGHN ("Vaughn"), a person of full age and majority and a current resident and citizen of Harris County, Texas, is an officer of S&S Trading who may be served at 1035 Townplace St., Houston, TX 77057.

(k)     L & S FOOD SALES CORP ("L & S Food Sales"), a corporation incorporated under the laws of Massachusetts with its principal place of business in Massachusetts. L & S Food Sales may be served through its registered agent, Alan Singer, at 25 West Union St., Ashland, MA 01721.

(l)     ALAN SINGER ("Singer"), a person of full age and majority and a current resident and citizen of Montgomery County, Massachusetts, is the owner of L&S Food Sales who may be served at 25 West Union St., Ashland, MA 01721.

(m)    HECTOR M. PEREZ ("Perez"), a person of full age and majority and a current resident and citizen of Miami-Dade County, Florida, is an employee of L&S Food Sales and owner and agent of Golden Bird Foods Inc., who may be served at 5941 SW 105th St., Pinecrest, FL 33156.

(n)     PERFORMANCE SALES & CONSULTING, LLC ("Performance Sales"), a Florida Limited Liability Company, whose sole member is Kevin E. Miller, a person of full age of majority and current resident and citizen of Madison

- 3 -

County, Florida. Performance Sales may be served through its registered agent, Kevin E. Miller, at 3491 Pall Mall Drive, Suite 204, Jacksonville, FL 32257.

(o)     KEVIN E. MILLER ("Miller"), a person of full age and majority and a current resident and citizen of Madison County, Florida, is the owner of Performance Sales who may be served at 1477 NE County Road, Apt. 150, Madison, FL 32340.

## II.  JURISDICTION AND VENUE

3.

Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a) because there exists complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

4.

Venue is proper in this district under 28 U.S.C. § 1391(b) because it is the judicial district in which a defendant resides and because it is the "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." The incidents forming the basis of this suit occurred in Bienville Parish, Louisiana.

## III.  FACTS

### A.  House of Raeford

5.

HORF is a poultry producer that owns and operates a number of poultry processing facilities throughout the Southeast United States where it processes and markets chicken products for food service, retail, and export markets.

- 4 -

6.

Approximately 80% - 85% of all poultry products sold by HORF are sold via agreements setting the terms, conditions, and price for a one-year period.

7.

The remaining 15% - 20% of poultry products sold by HORF are sold daily on the commodity or spot market at a fluctuating market based price. Urner Barry's poultry market is the standard used in negotiations and contracts throughout the poultry industry.

8.

Premium poultry products, such as boneless breast and thighs, are contracted for on a yearly basis at a fluctuating market price, while chicken frames – the core of the chicken that is left after the breast, thighs, wings, and legs have been removed – are generally contracted for on a yearly basis at a fixed price.

9.

To negotiate contracts for the sale of all poultry products, HORF employs a sales manager at each one of its poultry processing facilities.

10.

On June 10, 2008, HORF hired William Ross Hickman ("Hickman") as its sales manager for the Arcadia, Louisiana facility.

11.

As sales manager, Hickman negotiated contracts for the sale of all poultry products on behalf of HORF, supervised the transportation and shipping departments in Arcadia, Louisiana, and sold any excess fresh and frozen commodity chicken on a daily basis.

- 5 -

12.

Brian Whiteman ("Whiteman") was the Assistant Sales Manager for the Arcadia, Louisiana facility.

13.

Whiteman assisted Hickman with contract negotiations, supervising the transportation and shipping departments in Arcadia, Louisiana, and selling any excess fresh or frozen commodity chicken on a daily basis.

14.

In negotiating contracts for the sale of poultry products on behalf of HORF, Hickman's job as sales manager was to derive the highest possible return for HORF.

**B.  Hickman's Activities**

15.

In January 2011, Hickman formed Heritage Food Sales LLC ("Heritage Food Sales").

16.

At all relevant times herein, Heritage Food Sales was merely a sham entity created by Hickman with the intent to conceal Hickman's involvement with the schemes, fraud, and circumstances pled herein.

17.

Upon information and belief, Hickman, acting through Heritage Food Sales, acted as a broker, purchaser, and seller of poultry products.

18.

Hickman has engaged in business transactions on behalf of, and controlled, Heritage Food Sales and its operations from its formation in 2011 through 2018 and/or early 2019 as a means to

defraud HORF as set forth herein.

19.

Upon information and belief, Hickman conducted and controlled Heritage Food Sales'
business using email accounts in his wife Angela Hickman's name.

20.

Upon information and belief, Angela Hickman had full knowledge of the schemes and
tortious activities of Hickman and was an active participant therein. The tortious acts and schemes
employed by husband and wife, Hickman and Angela Hickman, are so intertwined that they are
each liable, in solido, for the damages that each caused to HORF.

21.

Angela Hickman assisted Hickman in committing all torts described herein by managing
the day-to-day activities and transactions involving Heritage Food Sales, including drafting and
issuing checks on behalf of Heritage Food Sales.

22.

Upon information and belief, Angela Hickman actively profited from the schemes
employed by Hickman and/or Heritage Food Sales and regularly received payments and/or
withdrew money from Heritage Food Sales' bank accounts as compensation for her assistance in
furthering Hickman and/or Heritage Food Sales' schemes.

23.

For example, on January 23, 2014, Hickman wrote a check to Angela Hickman on behalf
of Heritage Food Sales for $100,000.00.

24.

In order to pay participants in Hickman's schemes, Angela Hickman wrote checks on

behalf of Hickman and/or Heritage Food Sales.

25.

For example, on July 14, 2017, Angela Hickman wrote a check on behalf Heritage Food Sales to S&S Trading for $95,255.64. Similarly, on January 16, 2015, Angela Hickman wrote a check on behalf of Heritage Food Sales to All Trade Enterprises, LLC, and entity owned by Whiteman and his wife, Robin Whiteman, for $20,075.00.

26.

The checks drafted by Angela Hickman were instrumental in furthering the schemes and tortious conduct employed by Hickman, causing direct harm to HORF.

27.

Alternatively, Angela Hickman knew or should have known of the tortious conduct of Hickman and purposefully or negligently turned a blind eye in order to profit from the scheme and enjoy the lifestyle that Hickman's scheme provided for.

28.

While Hickman was employed as sales manager for HORF, Hickman and Angela Hickman profited from multiple schemes, each of which harmed HORF and deprived HORF of sales and profits to which HORF was rightfully entitled.

29.

These schemes employed by Hickman and Angela Hickman took multiple forms and included such things as payments for kickbacks and bribes, with Hickman engineering sales to "pass-through" entities at below market prices. Hickman also caused HORF to pay unearned commissions and other compensation to the entities named below in exchange for their agreement to repay a portion of the amounts received back to Hickman.

30.

When questioned on the various actors outlined below in his October 23, 2019 deposition, Hickman pled the Fifth Amendment more than one hundred twenty-five (125) times. A copy of this deposition is attached hereto as Exhibit A, which is expressly incorporated herein by reference.

**Hickman's Scheme Involving S&S Trading; Vaughn; Franklin; Baxter; Group 7792; and Lance Poole**

31.

In his position as sales manager for HORF, Hickman negotiated contracts on behalf of HORF for the sale of chicken frames from HORF to pass-through entities, such as S&S Trading, LLC ("S&S Trading") and Group 7792, Inc. ("Group 7792"), at a fixed rate.

32.

S&S Trading is owned and/or controlled by Donald E. Vaughn ("Vaughn"), James S. Baxter ("Baxter"), and Roger Franklin Baxter ("Franklin").

33.

Vaughn, Baxter, and Franklin acted through S&S Trading and oversaw and controlled the daily operations, accounts, contracts, and activities of S&S Trading.

34.

All purchases and sales by S&S Trading, including the purchase of chicken frames from HORF and the sale of chicken frames to Heritage Food Sales (for the benefit of Hickman and Angela Hickman) were made and controlled by Vaughn, Baxter, and Franklin.

35.

Upon information and belief, Vaughn, Baxter, and Franklin engaged in a scheme wherein they received kickbacks and/or bribes to participate in transactions wherein they would act as a

pass-through entity in order to assist Hickman and/or Heritage Food Sales in securing chicken frames from Hickman's employer, HORF, at a below market price without HORF realizing the true nature of the transaction.

36.

Upon information and belief, the actions of Vaughn, Baxter, and Franklin were carried out through S&S Trading and the kickbacks and bribes received by Vaughn, Baxter, and Franklin were often made in the form of rebates, brokerage fees, commissions, and guaranteed profits paid to S&S Trading such that Vaughn, Baxter, Franklin, and S&S Trading are collectively referenced below as "S&S Trading".

37.

Based on their direct involvement in the transactions involving S&S Trading, Vaughn, Baxter, and Franklin are individually liable for their own acts and all acts and/or transactions performed in the name of S&S Trading.

38.

Group 7792 was created by Lance Norris Poole ("Poole").

39.

Poole acted through Group 7792 and oversaw and controlled the daily operations, accounts, contracts, and activities of Group 7792.

40.

All purchases and sales by Group 7792, including the purchase of chicken frames from HORF and the immediate resale of chicken frames to Heritage Food Sales and/or Hickman was made and controlled by Poole.

- 10 -

41.

Upon information and belief, Poole engaged in a scheme wherein he received kickbacks and/or bribes to participate in transactions wherein he would act as a pass-through entity in order to assist Hickman and/or Heritage Food Sales in securing chicken frames from Hickman's employer, HORF, at a below market price without HORF realizing the true nature of the transaction.

42.

Upon information and belief, the actions of Poole were carried out through Group 7792 and the kickbacks and bribes received by Poole were often made in the form of guaranteed profits paid to Group 7792, such that Poole and Group 7792 are collectively referenced below as "Group 7792".

43.

Based on his direct involvement in the transactions involving Group 7792, Poole is individually liable for his own acts and all acts and/or transactions performed in the name of Group 7792.

44.

As part of Hickman's scheme to defraud HORF of profits, Hickman and/or Heritage Food Sales entered into agreements with S&S Trading and Group 7792, wherein S&S Trading and Group 7792 would purchase chicken frames from HORF at a reduced price.

45.

As a condition of the transaction described above, S&S Trading and Group 7792 agreed to buy chicken frames from HORF through Hickman and then immediately resell the chicken frames to Hickman's company, Heritage Food Sales, at a higher amount than the pass-through entities

originally paid to HORF.

46.

Upon information and belief, the spread between the prices paid and received by the pass-through entities were generally between one to two cents per pound of chicken frames, which constituted a substantial amount given the millions of pounds of product sold through the pass-through entities.

47.

After purchasing the chicken frames from the pass-through entities, Heritage Food Sales and/or Hickman then sold the chicken frames to the end user and/or exporter for a profit.

48.

For example, in 2014 through 2017, Hickman negotiated contracts on behalf of HORF with S&S Trading, which provided that S&S Trading would purchase chicken frames from HORF at $0.09 to $0.135 per pound for each fiscal year. Hickman did this with the intent to conceal the nature of the transaction and identity of Hickman and Hickman's involvement and ownership of Heritage Food Sales.

49.

In conjunction with the above transactions, Hickman negotiated a contract on behalf of himself and/or Heritage Food Sales with S&S Trading, which provided that Heritage Food Sales would immediately purchase those same chicken frames from S&S Trading at a price higher than originally paid by S&S Trading. In fact, S&S Trading never took possession of the chicken frames prior to transferring ownership to Heritage Food Sales.

50.

Hickman, operating as Heritage Food Sales, then resold the same chicken frames purchased

from S&S Trading to other entities for between $0.1225 and $0.18 per pound.

51.

The spread between the original purchase price paid by S&S Trading to HORF and the final sale price paid to Hickman and/or Heritage Food Sales by the end user/exporter was split between Hickman and S&S Trading. The foregoing was also done with the intent and purpose to financially benefit Angela Hickman, and at all times with Angela Hickman's knowledge and consent.

52.

Then, in 2018, Hickman negotiated a similar contract on behalf of HORF with Group 7792, which provided that Group 7792 would purchase chicken frames from HORF at $0.12 per pound for the fiscal year. Hickman did this with the intent to conceal the nature of the transaction and identity of Hickman and Hickman's involvement and ownership of Heritage Food Sales.

53.

In conjunction with the above transaction, Hickman negotiated a contract on behalf of himself and/or Heritage Food Sales with Group 7792, which provided that Heritage Food Sales would immediately purchase those same chicken frames from Group 7792 at a price higher than originally paid by Group 7792. In fact, Group 7792 never took possession of the chicken frames prior to transferring ownership to Heritage Food Sales and/or Hickman.

54.

Hickman, operating as Heritage Food Sales, then resold the same chicken frames purchased from Group 7792 to a different entity for $0.16 per pound.

55.

Upon information and belief, the spread between the original purchase price paid by Group

7792 to HORF and the final sale price paid to Heritage Food Sales by the end user/exporter was split between Hickman and S&S Trading. The foregoing was also done with the intent and purpose to financially benefit Angela Hickman, and at all times with Angela Hickman's knowledge and consent.

56.

Upon information and belief, Hickman used his position as sales manager to derive a reduced sales price for S&S Trading and Group 7792 by deceiving HORF into believing that the shipping terms of the agreements with S&S Trading and Group 7792 were freight on board ("FOB") Arcadia, Louisiana, when, in reality, Hickman instructed HORF to pay freight costs.

57.

This scheme deprived HORF of the profit that HORF would have made had Hickman (in his capacity as sales manager for HORF) secured contracts for HORF to sell the chicken frames directly to the end user and/or exporter.

58.

For instance, in 2018, HORF suffered a loss of more than $2,423,100.79 as a result of Hickman's deceptive actions and scheme with Poole and Group 7792.

59.

The purpose of using the pass-through entities was intentionally orchestrated by Hickman to hide the fact that Hickman, as the sales manager of HORF, was himself purchasing chicken frames from his employer, HORF, through the entity that he created, Heritage Food Sales, and then reselling said product at a higher price to the end user/exporter.

60.

In the transactions referenced above, the pass-through entities did not offer anything of

legal value to the transaction or end product, such as shipping, warehousing, etc. Rather, they were paid a guaranteed return on each transaction (generally ranging between one and two cents per pound of chicken frames) for their part in acting as the purchaser of chicken frames from HORF, which had the effect of hiding the true nature of the transaction. The conduct of the pass-through entities was intentional to conceal the true nature of the transaction for their, Hickman, Angela Hickman, and Heritage Food Sales' benefit.

61.

Despite never taking delivery of the chicken frames or adding anything of legal value to the transaction, the pass-through entities received compensation from Hickman and/or Angela Hickman via Heritage Food Sales through the payment of a guaranteed profit on the transaction. Such conduct was carried out by Hickman and/or Angela Hickman with the intent to conceal their involvement in this scheme from HORF.

62.

Upon information and belief, the pass-through entities also received bribes and/or kickbacks from Hickman by way of his directing HORF to pay the pass-through entities rebates and/or brokerage fees to which they had not earned and were not entitled to.

63.

The pass-through entities were willing and active participants in this bribery and/or kickback scheme and provided such services to Hickman and/or Heritage Food Sales in exchange for a guaranteed profit without providing anything of legal value to the transaction.

64.

Alternatively, the pass-through entities knew or should have known of the nature of the transactions at issue, including that they were depriving HORF of sales and profits by allowing

insider or non-arms lengths transactions to occur between HORF and Heritage Food Sales.

65.

For example, the pass-through entities negotiated with the same individual (*i.e.*, Hickman) for both the purchase of chicken frames from HORF and the subsequent sale of the same chicken frames to Heritage Food Sales. Thus, the pass-through entities knowingly dealt with the same individual on both sides of the transaction.

66.

The effect of the pass-through entities' participation in the above scheme is that the spread between the price originally paid to HORF and the price paid by the end-user/exporter was split between the pass-through entity and Hickman, Angela Hickman, and/or Heritage Food Sales, depriving HORF of the sales and profits to which it was rightfully entitled.

67.

Hickman also deceptively directed HORF to pay a rebate or brokerage fee to S&S Trading of $0.01 per pound of chicken frames purchased from HORF.

68.

Upon information and belief, S&S Trading accepted this rebate/brokerage fee despite knowing that it was assisting with an insider scheme in which an employee of HORF was purchasing product from HORF at a price lower than what other entities would have paid via a true arm's length transaction.

69.

Alternatively, S&S Trading knew or should have known that it was assisting with an insider scheme in which an employee of HORF was purchasing product from HORF at a price lower than what other entities would have paid via a true arm's length transaction.

- 16 -

70.

S&S Trading did not provide notice to HORF that S&S Trading was making payments to Heritage Food Sales and/or Hickman in exchange for receiving HORF products or as a result of receiving rebates/brokerage fees.

71.

The scheme employed by Hickman would not have been successful if S&S Trading and Group 7792 had not participated and/or turned a blind eye to the illegal, unfair, and improper actions of Hickman.

**Hickman's Bribery and/or Kickback Scheme Involving
L & S Trading; Alan Singer; and Hector Perez**

72.

While Hickman was employed as sales manager for HORF, Hickman was responsible for negotiating sales contracts through which HORF would sell premium chicken products such as boneless chicken breasts, chicken thighs, and chicken drums to buyers.

73.

From 2011 through 2018, Hickman entered into sales contracts with L & S Food Sales for the purchase of premium chicken products on favorable terms and for substantially below market prices.

74.

L & S Food Sales is owned and/or controlled by Alan Singer ("Singer") and Hector Perez ("Perez").

75.

Singer and Perez acted through L & S Food Sales and oversaw and controlled the daily

- 17 -

operations, accounts, contracts, and activities of L & S Food Sales, including negotiating the terms for purchases of premium chicken products from HORF for substantially below market prices and paying kickbacks to Hickman through Heritage Food Sales.

76.

Upon information and belief, in exchange for Hickman providing L & S Food Sales with premium chicken products from HORF at below market prices, L & S Food Sales made bribery and/or kickback payments to Hickman by way of checks issued to Hickman's company, Heritage Food Sales.

77.

L & S Food Sales did not advise HORF that it was making such payments to Heritage Food Sales and/or Hickman in exchange for receiving HORF products.

78.

Moreover, Hickman did not advise his employer, HORF, that he was receiving kickbacks from L & S Food Sales as a result of the favorable contract terms that he was providing to L & S Food Sales when they purchased premium chicken products from HORF.

79.

For example, on May 12, 2016, L & S Food Sales placed orders (a) for 40,000 pounds of boneless breasts at a price of $0.92 per pound, FOB, and (b) for 13,040 pounds of boneless breasts at a price of $0.90 per pound, FOB. On that date, sales of the identical product from the Arcadia plant to other customers ranged from $0.97 per pound to $1.22 per pound, and averaged $1.07 per pound (accounting for freight costs incurred by HORF).

80.

In return for the favorable terms, in 2016, L & S Food Sales issued checks in excess of

$50,000.00 to Hickman's company, Heritage Food Sales. Similarly, in 2017, L & S Food Sales issued checks in excess of $90,000.00 to Hickman's company, Heritage Food Sales.

81.

On September 21, 2018, L & S Food Sales placed an order for 40,000 pounds of boneless breasts at a price of $0.72 per pound, FOB. On that date, sales of the identical product from the Arcadia plant to other customers ranged from $0.75 per pound to $0.83 per pound, and averaged $0.78 per pound (accounting for freight costs incurred by HORF).

82.

Over the course of the years 2011 through 2018, L & S Food Sales purchased approximately 24 million pounds of boneless breast product from HORF's Arcadia plant.

83.

Upon information and belief, L & S Food Sales has paid bribery and/or kickback payments to Hickman by way of checks issued to Heritage Food Sales in excess of $575,000.00.

84.

L & S Food Sales paid money to Hickman and/or Heritage Food Sales that it was willing to pay to HORF, and which should have been paid directly to HORF, for the premium chicken product that it purchased from HORF.

85.

L & S Food Sales was an active and willing participant in Hickman's scheme to defraud and/or skim profits from HORF's sale of premium chicken products.

86.

Alternatively, L & S Food Sales knew or should have known of the nature of its payments to Hickman and/or Heritage Food Sales, including that such payments were depriving HORF of

profits to which HORF, not Hickman and/or Heritage Food Sales, was entitled.

87.

L & S Food Sales purposefully participated in Hickman's kickback scheme in order to receive product from HORF on favorable terms and/or gain a competitive advantage in the purchasing of premium chicken products.

88.

Alternatively, L & S Food Sales acted negligently to the detriment of HORF in failing to identify or recognize the nature of the transactions described above.

89.

L & S did not advise HORF that it was making payments to Hickman's company in exchange for the terms by which Hickman agreed to sell HORF's product.

## Hickman's Kickback Scheme Involving
## Performance Sales and Kevin Miller

90.

While Hickman was employed as sales manager for HORF, Hickman directed the payment of certain brokerage fees to entities involved in the sales of premium chicken products.

91.

Specifically, between 2011 and 2018, Hickman directed the payment of brokerage fees from HORF to Performance Sales.

92.

In exchange for these brokerage fees, and/or as part of the agreement with Hickman in which he would direct HORF to pay these brokerage fees, Performance Sales paid kickbacks to Hickman by way of checks issued to Heritage Food Sales.

93.

Performance Sales did not advise HORF that it was making the payment described above or that it was participating in the kickback scheme involving HORF's employee.

94.

Upon information and belief, between 2011 and 2018, Performance Sales paid more than $485,000.00 ($489.691.95) to Heritage Food Sales as a kickback to Hickman in exchange for HORF's payment of brokerage fees.

95.

Kevin Miller ("Miller") is the owner of Performance Sales, acted through Performance Sales, and oversaw and controlled its daily operations, accounts, contracts, and activities.

96.

Upon information and belief, the improper kickback payments made by Performance Sales to Hickman and/or Heritage Food Sales were in fact made by Miller, as he drafted the Performance Sales checks and participated in, orchestrated and controlled the kickback scheme described above.

97.

Based on his direct involvement in the transactions involving Performance Sales, Miller is individually liable for his own acts and all acts and/or transactions performed in the name of Performance Sales such that any reference to Performance Sales herein shall be considered a reference to Performance Sales.

**Whiteman's Participation in the Above Scheme**

98.

In his position as assistant sales manager for HORF, Whiteman assisted Hickman with negotiating contracts through which HORF would sell chicken frames.

- 21 -

99.

Upon information and belief, Whiteman engaged in a scheme with Hickman wherein he received bribes and/or kickbacks to participate in transactions wherein Heritage Food Sales would sell chicken frames to the end user and/or exporter for a profit, which deprived HORF of the profit that HORF would have made had Hickman (in his capacity as sales manager for HORF) and Whiteman (in his capacity as assistant sales manager for HORF) secured contracts for HORF to sell the chicken frames directly to the end user and/or exporter.

100.

Upon information and belief, Whiteman formed All-Trade Enterprise LLC ("All-Trade") in September 2011 for the sole purpose of receiving bribery and/or kickback payments from Hickman and/or Heritage Food Sales.

101.

Upon information and belief, Whiteman conducted and controlled All-Trade and its operations from its formation in 2011 through 2019.

102.

Upon information and belief, in exchange for Whiteman assisting Hickman with the scheme described above, Hickman and/or Heritage Food Sales made bribery and/or kickback payments to Whiteman by way of checks issued to Whiteman's company All-Trade.

103.

While Whiteman was employed as assistant sales manager for HORF, Whiteman profited from Hickman's schemes involving bribery and kickbacks, each of which harmed HORF and deprived HORF of sales and profits to which HORF was rightfully entitled.

104.

Upon information and belief, Hickman and/or Heritage Food Sales paid bribery and/or kickback payments to Whiteman by way of checks issued to Whiteman, individually, and All-Trade in excess of $1,360,000.00.

105.

The scheme employed by Hickman would not have been successful if Whiteman had not participated and/or turned a blind eye to the illegal, unfair, and improper actions of Hickman.

## IV.  CAUSES OF ACTION

### S&S Trading; Vaughn; Baxter; and Franklin

106.

HORF re-states and incorporates all of the foregoing paragraphs as if set forth herein.

107.

Under Louisiana law, he who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act. Accordingly, S&S Trading, Vaughn, Baxter, Franklin, Hickman, Angela Hickman, and Whiteman are liable in solido for all damages caused by their actions set forth herein.

108.

S&S Trading, Vaughn, Baxter, and Franklin are liable in solido for civil conspiracy to commit fraud, as they conspired together with Hickman and Whiteman to act as a pass-through entity to disguise the true nature of years' worth of transactions involving chicken frames to defraud HORF of sales and profits that HORF was entitled to.

109.

S&S Trading, Vaughn, Baxter, Franklin, Hickman and Whiteman had a meeting of the

- 23 -

minds in which S&S Trading, Vaughn, Baxter, and Franklin would assist Hickman and/or Whiteman to engage in fraudulent conduct involving the sale of chicken frames at a below market price with the intent of causing injury to HORF.

110.

As a result of the above conduct, S&S Trading, Vaughn, Baxter, and Franklin shared in the profits of Hickman and/or Whiteman's insider purchasing scheme involving chicken frames and were paid a guaranteed profit margin from Hickman's company, Heritage Food Sales, without providing anything of legal value.

111.

Additionally and/or alternatively, S&S Trading, Vaughn, Baxter, and Franklin are liable in solido for fraudulent misrepresentation and fraudulent concealment, as they intentionally misrepresented the nature of the transactions to which they were engaged in involving HORF and failed to disclose to HORF that they were immediately reselling chicken frames purchased from HORF back to HORF's own sales manager, Hickman, such that they were receiving a portion of the profit made by Hickman from his scheme.

112.

Additionally and/or alternatively, S&S Trading, Vaughn, Baxter, and Franklin engaged in honest services fraud, or a civil conspiracy to commit honest services fraud, to improperly skim profits from HORF's sale of chicken products.

113.

Additionally and/or alternatively, S&S Trading, Vaughn, Baxter, and Franklin engaged in unfair and deceptive trade practices in the trade and commerce of chicken frames causing the loss of sales and profits to HORF.

114.

As a result of S&S Trading, Vaughn, Baxter, and Franklin's unfair and deceptive trade practices, HORF is entitled to treble damages and attorney's fees under Louisiana Unfair Trade Practices Act, La. R.S. 51:1401, *et seq*.

**<u>Group 7792 and Poole</u>**

115.

HORF re-states and incorporates all of the foregoing paragraphs as if set forth herein.

116.

Under Louisiana law, he who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act. Accordingly, Group 7792, Poole, Hickman, Angela Hickman, and Whiteman are liable in solido for all damages caused by their actions set forth herein.

117.

Group 7792 and Poole are liable in solido for civil conspiracy to commit fraud, as they conspired together with Hickman and Whiteman to act as a pass-through entity to disguise the true nature of a year's worth of transactions involving chicken frames to defraud HORF of sales and profits that HORF was entitled to.

118.

Group 7792, Poole, Hickman and Whiteman had a meeting of the minds in which Group 7792 and Poole would assist Hickman and/or Whiteman to engage in fraudulent conduct involving the sale of chicken frames at a below market price with the intent of causing injury to HORF.

119.

As a result of the above conduct, Group 7792 and Poole shared in the profits of Hickman

- 25 -

and/or Whiteman's insider purchasing scheme involving chicken frames and were paid a guaranteed profit margin from Hickman's company, Heritage Food Sales, without providing anything of legal value.

120.

Additionally and/or alternatively, Group 7792 and Poole are liable in solido for fraudulent misrepresentation and fraudulent concealment, as they intentionally misrepresented the nature of the transactions to which they were engaged in involving HORF and failed to disclose to HORF that they were immediately reselling chicken frames purchased from HORF back to HORF's own sales manager, Hickman, such that they were receiving a portion of the profit made by Hickman from his scheme.

121.

Additionally and/or alternatively, Group 7792 and Poole engaged in honest services fraud, or a civil conspiracy to commit honest services fraud, to improperly skim profits from HORF's sale of chicken products.

122.

Additionally and/or alternatively, Group 7792 and Poole engaged in unfair and deceptive trade practices in the trade and commerce of chicken frames causing the loss of sales and profits to HORF.

123.

As a result of Group 7792 and Poole's unfair and deceptive trade practices, HORF is entitled to treble damages and attorney's fees under Louisiana Unfair Trade Practices Act, La. R.S. 51:1401, *et seq*.

**L & S Food Sales; Singer; and Perez**

124.

HORF re-states and incorporates all of the foregoing paragraphs as if set forth herein.

125.

Under Louisiana law, he who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act. Accordingly, L & S Food Sales, Singer, Perez, Hickman, Angela Hickman, and Whiteman are liable in solido for all damages caused by their actions set forth herein.

126.

L & S Food Sales, Singer, and Perez are liable in solido for civil conspiracy to commit fraud, as they conspired with Hickman to enter into sales contracts for the purchase of premium chicken products on favorable terms and for substantially below market price with the intent to defraud HORF of sales and profits that HORF was entitled to.

127.

L & S Food Sales, Singer, Perez, and Hickman had a meeting of the minds with Hickman in which L & S Food Sales, Singer, Perez, and Hickman would engage in fraudulent and deceptive conduct involving the sale of premium chicken products on favorable terms and for substantially below market price with the intent of causing injury to HORF in exchange for kickback and/or bribery payments from Hickman to L & S Food Sales, Singer, and Perez.

128.

As a result of the above conduct, L & S Food Sales, Singer, and Perez shared in the profits of Hickman's insider sales scheme involving premium chicken products by making bribery and/or kickback payments to Hickman by way of checks issued to Hickman's company, Heritage Food

Sales, in exchange for Hickman providing L & S Food Sales with premium chicken products from HORF on favorable terms and for substantially below market price.

129.

Additionally and/or alternatively, L & S Food Sales, Singer, and Perez are liable in solido for fraudulent misrepresentation and fraudulent concealment, as they intentionally misrepresented the nature of the transactions to which they were engaged in involving HORF and failed to disclose to HORF that they were making bribery and/or kickback payments to Hickman by way of checks issued to Hickman's company, Heritage Food Sales, in exchange for Hickman providing L & S Food Sales with premium chicken products from HORF on favorable terms and for substantially below market price.

130.

Additionally and/or alternatively, L & S Food Sales, Singer, and Perez engaged in honest services fraud, or a civil conspiracy to commit honest services fraud, to improperly skim profits from HORF's sale of chicken products.

131.

Additionally and/or alternatively, L & S Food Sales, Singer, and Perez engaged in unfair and deceptive trade practices in the trade and commerce of premium chicken products causing the loss of sales and profits to HORF.

132.

As a result of L & S Food Sales, Singer, and Perez's unfair and deceptive trade practices, HORF is entitled to treble damages and attorney's fees under Louisiana Unfair Trade Practices Act, La. R.S. 51:1401, *et seq*.

## **Performance Sales and Miller**

133.

HORF re-states and incorporates all of the foregoing paragraphs as if set forth herein.

134.

Under Louisiana law, he who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act. Accordingly, Performance Sales, Miller, Hickman, Angela Hickman, and Whiteman are liable in solido for all damages caused by their actions set forth herein.

135.

Performance Sales and Miller are liable in solido for civil conspiracy to commit fraud, as they conspired together with Hickman for the payment of brokerage fees involving premium chicken products to defraud HORF of sales and profits that HORF was entitled to.

136.

Performance Sales, Miller, and Hickman had a meeting of the minds in which Performance Sales and Miller would assist Hickman to engage in fraudulent conduct involving brokerage fees for the sale of premium chicken products with the intent of causing injury to HORF.

137.

As a result of the above conduct, Performance Sales and Miller shared in the profits of Hickman's kickback scheme involving brokerage fees paid in the sale of premium chicken products by making kickback payments to Hickman by way of checks issued to Hickman's company, Heritage Food Sales.

138.

Additionally and/or alternatively, Performance Sales and Miller are liable in solido for

- 29 -

fraudulent misrepresentation and fraudulent concealment, as they intentionally misrepresented the nature of the brokerage fees to which they received from HORF for the sale of premium chicken products and failed to disclose to HORF that they were making kickback payments to Hickman by way of checks issued to Hickman's company, Heritage Food Sales, in exchange for Hickman providing Performance Sales with certain brokerage fees.

139.

Additionally and/or alternatively, Performance Sales and Miller engaged in honest services fraud, or a civil conspiracy to commit honest services fraud, to improperly skim profits from HORF's sale of chicken products.

140.

Additionally and/or alternatively, Performance Sales and Miller engaged in unfair and deceptive trade practices in the trade and commerce of premium chicken products causing the loss of sales and profits to HORF.

141.

As a result of Performance Sales and Miller's unfair and deceptive trade practices, HORF is entitled to treble damages and attorney's fees under Louisiana Unfair Trade Practices Act, La. R.S. 51:1401, *et seq.*

### Hickman and Heritage Food Sales

142.

HORF re-states and incorporates all of the foregoing paragraphs as if set forth herein.

143.

Under Louisiana law, he who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.

Accordingly, Heritage Food Sales, Hickman, Angela Hickman, Whiteman, and all other co-conspirators are liable in solido for all damages caused by their actions set forth herein.

144.

As sales manager, Hickman was charged with negotiating contracts and conducting business on behalf of HORF. In this capacity, Hickman owed a fiduciary duty to HORF, as HORF placed its confidence and trust in Hickman to conduct business on its behalf and in its best interest.

145.

Hickman also owed HORF fiduciary duties as the employee charged with overseeing the shipping department.

146.

In his role as sales manager and employee of HORF, Hickman breached several fiduciary duties, to wit:

(a)   Hickman intentionally and in bad faith acted against the interests of his employer, HORF, for personal gain, with full knowledge that doing so was detrimental to the interests of HORF;

(b)   Hickman steered and diverted business from HORF to Heritage Food Sales for personal gain and with full knowledge that doing so was detrimental to the interests of HORF;

(c)   Hickman misrepresented and deceived HORF with regard to the terms of contracts for the sale of chicken frames;

(d)   Hickman paid HORF employees and other individuals on a per load basis to participate in his scheme; and

(e)   Hickman misrepresented and deceived HORF into paying brokerage fees to

- 31 -

various companies and in exchange received kickbacks;

(f)     Hickman tortuously interfered with HORF's contractual relationship with
its purchasers; and

(g)     Hickman breached the HORF employment contract and the HORF
severance agreement in which Hickman was obligated to not take unfair
advantage of anyone through manipulation, concealment, abuse of
privileged information, misrepresentation of material facts, and prevent
fraud.

147.

Additionally and/or alternatively, Hickman and Heritage Food Sales engaged in unfair and
deceptive trade practices in the trade and commerce of chicken frames and premium chicken
products causing the loss of sales and profits to HORF.

148.

Hickman intentionally diverted HORF's customers to Heritage Food Sales for the benefit
of himself, Angela Hickman, and Heritage Food Sales.

149.

Additionally, Hickman deceived HORF to believe that he negotiated contracts on behalf
of HORF for the sale of chicken frames with the shipping terms being freight on board ("FOB")
Arcadia, Louisiana, when, in reality, Hickman used his position as Sales Manager to deceive
HORF into paying freight.

150.

As a direct and proximate result of Hickman's deceptive actions, HORF paid freight costs
and derived significant lower profits than it would have in the absence of Hickman's deceptive

conduct and scheme.

151.

Hickman and Heritage Food Sales' deceptive conduct, as described herein, constitutes a violation of the Louisiana Unfair Trade Practices Act, La. R.S. 51:1401, *et seq*. ("LUTPA").

152.

As a direct and proximate result of Hickman's deceptive actions, HORF has suffered continuing economic damages, including, but not limited to, loss of profits.

**Angela Hickman**

153.

HORF re-states and incorporates all of the foregoing paragraphs as if set forth herein.

154.

Under Louisiana law, he who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act. Accordingly, Heritage Food Sales, Hickman, Angela Hickman, Whiteman, and all other co-conspirators are liable in solido for all damages caused by their actions set forth herein.

155.

Angela Hickman is liable in solido for civil conspiracy to commit fraud, as she conspired together with Hickman in committing all torts described herein.

156.

Angela Hickman is liable for honest services fraud, or a civil conspiracy to commit honest services fraud, to improperly skim profits from HORF's sale of chicken products.

157.

Angela Hickman's conduct, as described herein, constituted deceptive and unfair conduct,

such that she violated the Louisiana Unfair Trade Practices Act, La. R.S. 51:1401, *et seq.* ("LUTPA").

### 158.

Alternatively, Angela Hickman acted negligently in assisting Hickman and/or taking actions on behalf of Heritage Food Sales that caused direct and immediate harm to HORF.  Angela Hickman knew or should have known of the tortious conduct of Hickman and purposefully or negligently turned a blind eye in order to profit from the scheme and enjoy the lifestyle that Hickman's scheme provided for.

### **Whiteman**

### 159.

HORF re-states and incorporates all of the foregoing paragraphs as if set forth herein.

### 160.

Under Louisiana law, he who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act. Accordingly, Whiteman is liable in solido for all damages caused by his actions set forth herein.

### 161.

As assistant sales manager for HORF, Whiteman maintained a relationship with HORF that imposed various fiduciary duties upon him.

### 162.

In his role as agent and employee of HORF, Whiteman has breached several fiduciary duties, to wit:

(a)     Whiteman intentionally and in bad faith acted against the interests of his employer, HORF, for personal gain, with full knowledge that doing so was

detrimental to the interests of HORF;

(b)    Whiteman diverted business from HORF to Heritage Food Sales for personal gain and with full knowledge that doing so was detrimental to the interests of HORF;

(c)    Whiteman was paid by Hickman on a per load basis to participate in Hickman's scheme;

(d)    Whiteman received kickbacks, bribery payments, and/or improper commission from Heritage Food Sales of more than $1,360,000.00 as a result of his participation in the schemes;

(e)    Whiteman tortuously interfered with HORF's contractual relationship with its purchasers; and

(f)    Whiteman breached the HORF employment contract and the HORF severance agreement in which Whiteman was obligated to not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, and prevent fraud.

163.

Additionally and/or alternatively, Whiteman engaged in unfair and deceptive trade practices in the trade and commerce of chicken frames and premium chicken products causing the loss of sales and profits to HORF.

164.

As an alternative theory of recovery, each of the named defendants above acted negligently under Louisiana Code of Civil Procedure article 2315.

165.

In the further alternative, each of the defendants have been unjustly enriched without cause at the expense of HORF and are bound to compensate HORF for all lost profits to which HORF was entitled absent the defendants' actions.

## V.  REQUEST FOR JURY TRIAL

166.

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the plaintiff demands a trial by jury on all issues so triable.

## VI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff, HOUSE OF RAEFORD FARMS OF LOUISIANA, L.L.C., prays:

(a)     that the Defendants be cited to appear and answer this petition within the delays allowed by law; and

(b)     that after due proceedings are had, the Court enter a judgment in favor of Plaintiff and against the defendants in solido to the extent allowed by law, for all sums reasonable in the premises in an amount reasonable for the damages sustained by Plaintiff, together with reasonable attorney fees, interest from the date of judicial demand until paid, and for all costs of this proceeding.

Respectfully submitted,

COOK, YANCEY, KING & GALLOWAY
A Professional Law Corporation

By:   /s/ Sidney E. Cook, Jr.
    Sidney E. Cook, Jr. #1311
    David J. Hemken #35168
    Josh L. Powell #38378

333 Texas Street, Suite 1700
P. O. Box 22260
Shreveport, LA 71120-2260
Telephone: (318) 221-6277
Facsimile: (318) 227-7850
sidney.cook@cookyancey.com
david.hemken@cookyancey.com
josh.powell@cookyancey.com

JORDAN PRICE WALL GRAY JONES &
CARLTON, PLLC

By:   /s/ J. Matthew Waters
    J. Matthew Waters #40290-NC

1951 Clark Ave.
P.O. Box 10669
Raleigh, NC 27605
Telephone: (919) 828-2501
Facsimile: (919) 834-8447
mwaters@jordanprice.com

ATTORNEYS FOR HOUSE OF RAEFORD
FARMS OF LOUISIANA, L.L.C.

- 37 -

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the above and foregoing was filed with the U.S. District Court for the Western District of Louisiana by electronic case filing/case management and that a copy of the same was served on the opposing parties by electronic notification or by U.S. mail, postage pre-paid.

Shreveport, Louisiana, this 16th day of December, 2019.

_/s/ Sidney E. Cook, Jr._
Sidney E. Cook, Jr.
